# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

EDWARD E. HARRIS          )
                                 )

       Plaintiff,           )
                                 )

       v.               )   Civil Action No. 04-2132 (RBW)
                                 )

WACKENHUT SERVICES, INC.,   )
        Defendant.      )
_____)

## MEMORANDUM OPINION

The plaintiff, Edward Harris, brings this action against the defendant, Wackenhut

Services, Inc. ("Wackenhut"), pursuant to the District of Columbia Human Rights Act ("Human

Rights Act"), D.C. Code §§ 2-1401.01(a)(1), 2-1402.11(a)(1), and 2-1402.61(a) & (b) (2001),

asserting claims of having been subjected to (1) a hostile work environment because of his race;

(2) disparate treatment based on his race; (3) retaliation; and (4) constructive discharge.[1]

Complaint ("Compl.") at 14-16.  Specifically, the plaintiff alleges that the defendant subjected

him "to a hostile work environment and constructively discharged him by discriminatorily

demoting him and depriving him of his supervisory responsibilities over approximately 1,000

employees and retaliating against him for opposing senior management's discriminatory

treatment of the defendant's African American employees."  Compl. at 2.  Currently before this

Court are the defendant's Motion for Summary Judgment ("Def.'s Mot.") and the plaintiff's

---

[1]  Although the plaintiff does not clearly indicate in his complaint that he is asserting a
constructive discharge claim as a cause of action by explicitly placing the claim under the heading
"Causes of Action", it nonetheless appears that the plaintiff is asserting a constructive discharge claim in
connection with his race discrimination claim.  Compl. ¶¶ 30-32, 38.

Motion for Partial Summary Judgment ("Pl.'s Mot.").[2]  Upon consideration of the parties'

submissions and the entire record, the defendant's Motion for Summary Judgment must be

denied in part and granted in part and the plaintiff's Motion for Partial Summary Judgment must

be denied.

## I.  FACTUAL BACKGROUND

The following facts are undisputed except where otherwise noted.[3]  "[H]eadquartered in

Palm Beach Gardens, Florida, Wackenhut is a world leader in providing high-end armed and

unarmed security personnel, paramilitary protective forces, law enforcement officers, fire and

rescue services, aviation operations and support, base operations and facility management, entry

level training, and cleared personnel to government and selected commercial customers."  Def.'s

Mem.,  Exhibit ("Ex.") 1 (Declaration of David W. Foley) ("Foley Decl.") ¶ 2.  Its National

Capital Region operations provides management oversight for several security contracts in the

greater Washington, D.C. area, which includes the District of Columbia, Virginia, and Maryland.

Id., Ex. 2 (Deposition of David Foley) ("Foley Dep.") at 88; Compl. ¶ 12.  Wackenhut acquired

most of the security contracts in the greater Washington, D.C. area  when it purchased the assets

---

[2]  The following papers have also been submitted in connection with the defendant's motion: (1) Wackenhut Services, Inc.'s Memorandum In Support of Its Summary Judgment Motion ("Def.'s' Mem."), (2) Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"), including Material Facts Disputed by Plaintiff ("Pl.'s Statement of Disputed Facts"), and (3) Defendant's Reply To Plaintiff's Opposition to Wackenhut Services, Inc.'s Motion for Summary Judgment  ("Def.'s Reply").  The following papers have been filed in connection with the plaintiff's Motion for Partial Summary Judgment: (1) Wackenhut Services, Inc's Opposition to Plaintiff's Summary Judgment ("Def.'s Opp'n") and (2) Plaintiffs Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Pl.'s Reply").

[3]  "In deciding whether there is a genuine issue of material fact [precluding a grant of summary judgment pursuant to Federal Rule of Civil Procedure 56(c)], the [C]ourt must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record." Dist. Intown Props. Ltd. v. District of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999) (citation omitted).

of another security contractor, Areawide Security ("Areawide").  Id., Ex. 3 (Deposition of

Edward Harris) ("Harris Dep.") at 22, 24-25, 27-28, Ex. 4 (Deposition of James Long) ("Long

Dep.") at 46.  For a period of time after the purchase, Wackenhut managed the contracts acquired

from Areawide under the name Wackenhut Areawide.  Id.  Later, Wackenhut Areawide was

renamed Wackenhut Services Inc.  Id., Ex. 3 (Harris Dep.) at 22-23, Ex. 4 (Long Dep.) at 46-47.

The plaintiff worked for Wackenhut from September 1998 until December 2003.  Def.'s

Mem., Ex. 2 (Foley Dep.) at 220, Ex. 3 (Harris Dep.) at 261-262.  Wackenhut hired the plaintiff

in September 1998, at the a salary of $60,000 per year to manage its interim contract to provide

security services at the Ronald Reagan Building located in the District of Columbia.[4]  Id., Ex. 3

(Harris Dep.) at 15-18 & Attachment ("Attach.") 3 (Wackenhut New Hire Form), Ex. 4 (Long

Dep.) at 44-45.  Three months later, in December 1998, Wackenhut reassigned the plaintiff to a

permanent position as Director of Security Operations for Wackenhut Areawide Operations.  Id.,

Ex. 3 ( Harris Dep.) at 19-20, Ex. 3 at Attach. 4 (Memorandum from Weldon Howard to the

plaintiff, dated December 16, 1998).  A year later, in November 1999, Wackenhut promoted the

plaintiff to the position of Corporate Vice President and General Manager of its National Capitol

Region, id., Ex. 3 (Harris Dep.) at 30-31, 42-43 & Attach. 6 (Letter from James L. Long to

Plaintiff, dated November 1, 1999) ("Offer Letter") & Attach. 8 (Memorandum from James L.

Long to All District/Area/Branch Offices–Subsidiaries, Facilities, Headquarters Department

Heads, dated November 2, 1999), and his annual salary was increased to $80,000, id., Ex. 3 at

Attach. 6 (Offer Letter).

Wackenhut increased the plaintiff's annual salary again the following year to

---

[4] The plaintiff was recruited from the United States Air Force where he had served in a high-level position at the rank of a Lieutenant Colonel.  Compl. ¶¶ 5,7-8.

approximately $83,600, effective October 2000.  Id., Ex. 3 (Harris Dep.) at 43.  Additionally, Wackenhut awarded the plaintiff a year-end $7,500 bonus.  Id. at 47.  Effective November 2001, Wackenhut gave the plaintiff another salary increase, raising it to $87,362 per year.  Id. at 46-47 & Attach. 10 (Personnel Action Change Form, dated November, 2001).  In addition to giving him a pay raise, Wackenhut awarded the plaintiff a year-end 2001 bonus of approximately $17,000.  Id., Ex. 3 (Harris Dep.) at 47, 55.  Effective November 2002, Wackenhut increased the plaintiff's salary to approximately $92,603.[5]  Id. at 56-57 & Attach. 11 (Personnel Action Change Form, dated by Payroll October 25, 2002).  Additionally, Wackenhut awarded the plaintiff a year-end 2002 bonus of more than $31,000.  Id., Ex. 3 (Harris Dep.) at 57.  In November 2003, Wackenhut increased Plaintiff's salary to approximately $95,844.  Id., Ex. 3 (Harris Dep.) at 58-59 & Attach. 12 (Personnel Action Change Form, dated November 3, 2003).  However, the plaintiff did not receive a year-end bonus for 2003 because he terminated his employment before the year expired.[6]  Id., Ex. 4 (Long Dep.) at 118-119.

## A.    Club Memberships

The plaintiff contends that Wackenhut provided certain employees – Larry Luper, Jack Faulkner, Sam Brinkley, and Paul Donahue – with memberships in exclusive clubs and

---

[5] With this increase, the plaintiff's salary exceeded what Wackenhut paid three of its white vice presidents – "Mr. Berrong, William Plutt and Craig Timmerman."  Def.'s Mem., Ex. 1 (Foley Decl.) ¶ 7. However, the plaintiff has no idea how his salary compared to the salary Wackenhut paid other vice presidents at that time period because this information was not conveyed to him.  Id., Ex. 3  (Harris Dep.) at 47, 55 -57 & Attach. 11 (Personnel Action Change Form, dated November 4, 2002).

[6] As previously noted, there is a dispute as to whether the plaintiff abandoned his job or was constructively discharged.  However, Wackenhut contends that it also did not pay a year-end bonus to a white vice president, Mr. Timmerman, who quit his position during the middle of a year.  Def.'s Mem., Ex. 1 (Foley Decl.) ¶ 12, Ex. 4 (Long Dep.) at 119, Ex. 2  (Foley Dep.) at 220, Ex. 3 (Harris Dep.) at 261-262.

organizations while not affording such memberships to him.  Def.'s Mem., Ex. 3 (Harris Dep.) at

63; Compl. ¶16.  The plaintiff, however, cannot identify the clubs or organizations to which the

aforementioned employees were provided memberships by Wackenhut.  Id. at 68-69, 72-73.

Further, the plaintiff never heard Luper, Faulkner, Brinkley, or Donahue say that Wackenhut had

sponsored or paid for their memberships in any club or organization.  Id. at 73.  In addition, the

plaintiff has not read any documents indicating that Wackenhut paid for such memberships.  Id.

Instead, the plaintiff bases his allegations about Wackenhut's role in these employees' purported

club or organization memberships on portions of conversations he overheard Luper, Faulkner,

Brinkley, or Donahue having about their evening activities, id. at 72, which the men would

discontinue whenever he approached them.  Id. at 69, 72-73.

## B.       The Condition of the Plaintiff's Office Space

Most National Capitol Region employees are security personnel who work in the field at

specific contract sites.  Def.'s Mem., Ex. 3 (Harris Dep.) at 183.  However, the plaintiff's central

work station was at the National Capitol Region's office located in a Camp Springs, Maryland.[7]

Id. at 13-14, 25.  In addition to the plaintiff, approximately sixteen other employees worked at the

Camp Springs location.  Id. at 183-184.  The plaintiff contends that he expressed concerns to

Wacknehut regarding maintenance problems at the building, including, but not limited to, a

leaking roof, which caused flooding on the seventh floor, inoperable elevators, power outages,

---

[7] Wackenhut leased the space from a neighborhood church.  Def.'s Mem., Ex. 3 (Harris Dep.) at
185.  Wackenhut acquired the lease from Areawide when Wackenhut purchased that company's assets.
Id., Ex. 4 (Long Dep.) at 83-84.  Located a short walk from a future subway station near a large parking
lot, and subject to a favorable long-term lease, Wackenhut contends that one of the reasons it acquired
Areawide's assets was the location of the Camp Springs office.  Id.

and broken water and sewer pipes.  Compl. ¶ 21.  Although it is not clear from the record who

was responsible for working with the landlord to remedy the alleged problems, the defendant

contends that it was the plaintiff's responsibility as the National Capitol Region's Vice President

and General Manager.  Def.'s Mem., Ex. 6 (Faulkner Dep.) at 59-60.  Nevertheless, after the

plaintiff raised his concerns, the defendant considered moving the plaintiff to a new location in

downtown Washington, D.C.  Id., Ex. 3 (Harris Dep.) at 197, 204.  However, the plaintiff

declined the defendant's offer to move him because he believed it "made[] no sense" for him to

be separated by 30 miles from the office employees he was required to supervise.  Id. at 204, 206.

Rather, he believed that the entire staff should have been moved to the Washington, D.C. office.

Id.

## C.      The Plaintiff's Company Car

Senior Wackenhut employees who need cars to perform their work receive them from the

company.  Def.'s Mem., Ex. 1 (Foley Decl.) ¶ 14.  The plaintiff contends that the company

vehicles of white general managers and vice presidents were of significantly higher quality than

the vehicles provided to him.  Compl. ¶ 19.

Wackenhut's practice is to allow employees to use the cars until they are fully

depreciated, whereupon they are sold at auctions.  Def.'s Mem., Ex. 1 (Foley Decl.) ¶ 14.

Wackenhut advised the plaintiff that he would be provided an "existing company vehicle" during

his tenure as Vice President and General Manager.  Id., Ex. 3 (Harris Dep.) at 186-187 & Attach.

6 (Offer Letter).  When he assumed the Vice President and General Manager position in 1999,

the plaintiff was assigned a 1994 Ford Taurus.  Id., Ex. 3 (Harris Dep.) at 187-188.  The

following year, Wackenhut assigned the plaintiff a 1998 Buick Century.[8] Id. at 189-190.  And, in

2002 or 2003, Wackenhut assigned him a new Ford Taurus.[9] Id., Ex. 3 (Harris Dep.) at 193-194.

The plaintiff concedes that his assigned vehicles functioned and served his business needs.  Id.,

Ex. 3 (Harris Dep.) at 188, 194-195, 197.  He further concedes that he complained to no one

about the vehicle he was assigned.  Id. at 195.

**D.      Holiday Budget and Purchasing Authority**

There is a dispute as to the plaintiff's purchasing authority and the holiday budget that

was allocated to him by Wackenhut for the National Capitol Region.  Specifically, the plaintiff

contends that Wackenhut "required [him] to ask permission [to purchase] small items, such as

holsters, while general managers and vice presidents were given freedom to decide what was best

for their organization."  Compl. ¶ 18.  Wackenhut, however, contends that it imposed the same

spending limitations on the plaintiff's white successor as it imposed upon the plaintiff.  Def.'s

Mem., Ex. 1 (Foley Decl.) ¶ 16.  In addition, the plaintiff contends that Wackenhut allocated to

the National Capitol Region a smaller holiday budget than it allocated to some offices headed by

the white employees.  Compl. ¶ 24.  Wackenhut contends, however, that it allocated essentially

the same amount of funds to the plaintiff's white successor as the Company allocated to the

plaintiff.  Def.'s Mem., Ex. 1 (Foley Decl.) ¶ 17.

---

[8] After the plaintiff's departure from Wackenhut, the company assigned the Buick Century to the plaintiff's white successor.  Def.'s Mem., Ex. 1 (Foley Decl.) ¶ 15.

[9] The plaintiff contends that he received authorization from Jim Long to receive a new vehicle after he was assigned to pick up Long, Wackenhut's President and Chief Executive Officer at the time, from a meeting while he was visiting Washington, D.C. Def.'s Mem., Ex. 3 (Harris Dep.) at 194. According to the plaintiff, he was told by Mr. Long during the visit that the car was in poor condition and informed the plaintiff to contact Jack Faulkner, Wackenhut's Executive Vice-President at the time, and advise him that Long had given his authorization for the plaintiff to receive a new car.  Id.

7

**E.      Request for Pay Raises for the National Capitol Region's Administrative Employees**

During at least one conference call before the November 2003 General Manger's

Conference in which Jack Faulkner, Wackenhut's Executive Vice President at the time, was one

of the participants, the plaintiff expressed concerns about the low wages his staff at the National

Capitol Region office were receiving.  Pl.'s Mot., Ex. 3 (Deposition of Jack Faulkner) at 16-19;

Compl. ¶ 26.  Mr. Faulkner believed the plaintiff was going to prepare a document concerning

the wage situation for the purpose of trying to secure higher wages for the National Capitol

Region staff.  Pl.'s Mot., Ex. 3 (Deposition of Jack Faulkner) at 17-19.  It is unclear what was

exactly said about the wages issue, although Mr. Faulkner testified that Mr. Foley would have

been the individual responsible for addressing the matter.  Id. at 17.

At Wackenhut's November 2003 General Managers Conference, the plaintiff presented to

Mr. Foley a memorandum proposing pay increases for the National Capitol Region's

administrative employees.  Def.'s Mem., Ex. 3  (Harris Dep.) at 226-228, 238, 240-41 & Attach.

14 (Memorandum from National Capitol Region employee Sheldon Salter to the plaintiff, dated

November 5, 2003) ("Compensation Memorandum").[10]  The administrative employees in the

National Capitol Region office were predominately African-American.[11]  Pl.'s Mot., Ex. 1

(Second Deposition of David Foley) ("Foley Dep. II") at 126.   The plaintiff's memorandum

proposes pay increases for National Capitol Region employees, Def.'s Mem., Ex. 3 (Harris Dep.)

at 228, 232, 236, explaining that the recommended changes were necessary for that office to stay

---

[10]Mr. Slater prepared this memorandum for the plaintiff to document the plaintiff's recommendation for pay increases and his concerns regarding the salary of the National Capitol Region staff.  Def.'s Mem., Ex. 3 (Harris Dep.) 228-230.

[11] Only three of the sixteen administrative employees were white.  Def.'s Mem., Ex 3 (Harris Dep.) at 184.

competitive and retain its personnel.  Id. at 239-240.  Specifically, the memorandum submitted to

Mr. Foley indicated that in order to retain the National Capitol Region's highly skilled and

devoted specialists, it was necessary to increase their salaries.  Id. Attach. 14 (Compensation

Memorandum).  Mr. Slater further indicated in his memorandum that "after reviewing the current

Federal Wage Determination, the current wages for comparable positions [for] both on and off

contracts, and the scarcity of certain skills and knowledge," coupled with the high cost of living

in the Washington, D.C. metropolitan area, warranted salary increases for the National Capitol

Region's administrative employees.  Id.  However, no action was taken by Mr. Foley on the

plaintiff's pay increase proposal when it was presented to him.  Id. at 242.  Instead, Mr. Foley

said he would have to review the proposal at a later time.  Id. at 242, 250.

## F.       Alleged Offensive Remarks

_____The plaintiff alleges that Wackenhut subjected him to the following racial jokes and other

racially offensive statements.  Compl. ¶ 17; Def.'s Mem., Ex. 3 (Harris Dep.) at 85, 88.

### 1.       Larry Luper's "Ohm Boy" Riddle

The plaintiff contends that Larry Luper once told the plaintiff the following riddle:  What

do you call a black electrician in West Palm Beach, Florida?  An Ohm Boy.  Def.'s Mem., Ex. 3

(Harris Dep.) at 85-86; Compl. ¶ 17.  Mr. Luper allegedly communicated the riddle during a fall

2002 telephone conversation, Def.'s Mem., Ex. 3  (Harris Dep.) at 90-91, resulting in the plaintiff

terminating the call.  Id. at 92-93.  Later that day, the plaintiff telephoned Mr. Faulkner, then

Wackenhut's Executive Vice President, and explained that the plaintiff did not appreciate Mr.

Luper's humor.  Id. at 95.  Mr. Faulkner purportedly apologized for the comment and said that he

would "get with" Mr. Luper.  Id. at 95-96; Compl. ¶ 26.  Approximately two days later, the

plaintiff told Luper that the Plaintiff disliked the riddle.  Def.'s Mem., Ex. 3 (Harris Dep.) at 93-

95.  Luper allegedly apologized, and never made any statement of that nature again.  Id.

### 2.      **Michael Gallagher's "Black Bitch" Remark**

The plaintiff contends that during a fall 2002 telephone conversation, Michael Gallagher

called the plaintiff a "black b[i]tch."  Id. at 85- 87, 99-100.  After hearing Mr. Gallagher's

statement, the plaintiff hung up the telephone.  Id. at  85, 87, 99-100.  The plaintiff did not report

the matter to anyone, id. at 102-103, but represents that he told Mr. Gallagher about 30 minutes

later that he disliked the remark,  id. at 101-102.  The plaintiff asserts that he basically told him:

> Mike, I didn't appreciate that joke that you just shared with me or
> that comment that you just shared with me and I don't want to hear
> that crap.  We don't go there.  We can go a lot of places, but again,
> we're not talking about race, religion or ethnic origin.

Id. at 102.  Mr. Gallagher purportedly apologized immediately, id., and, the plaintiff never heard

him make another racist comment, id. at 103.

### 3.      **Mr. Long's Ghetto Remark**

The plaintiff contends that during a fall 2003 manager's conference James Long, then

Wackenhut's President and Chief Executive Officer, stated that Richard Allen lives in the

ghetto.[12]  Id. at 114; Compl. ¶ 28.  Mr. Allen is African-American.  Def.'s Mem., Ex. 1 (Foley

Decl.) ¶ 10.

The defendant contends that the comment is race-neutral because Mr. Allen lives in the

Woodside Plantation neighborhood of Aiken, South Carolina, which is the city's most exclusive

community.  Def.'s Mem., Ex. 3 (Harris Dep.) at 115, Ex. 5 (Allen Dep.) at. 23-24.  The

---

[12] The plaintiff admitted that he did not speak to Mr. Long about the comment or made a
complaint.  Def.'s Mem., Ex. 3 (Harris Dep.) at 117-118.

defendant notes that it is a gated community, contains three world-class 18-hole golf courses and an additional nine-hole golf course, a premier club, spacious lots, and quiet streets, all in a comfortable setting that has a security patrol 24 hours per day, 7 days per week.  Id., Ex. 5 (Allen Dep.) at 37- 38.  And it is allegedly commonly referred to the "Westinghouse Ghetto," due to the many Westinghouse Corporation executives and other community leaders who reside there.  Id., Ex. 5 (Allen Dep.) at 23-25, 34, 36.

### 4.     Comments Made During Conference Calls Regarding Wackenhut's Contract with the Department of Justice

On October 1, 2003, Wackenhut began work under a security contract with the United States Department of Justice ("DOJ").  Def.'s Mem., Ex. 2  (Foley Dep.) at 89, 90, Ex. 3  (Harris Dep.) at 297, 299 & Attach.16 (Electronic Mail Memorandum from Glenn T. Emig to Larry Luper, dated November 21, 2003) ("Emig Memorandum").  Wackenhut assigned operational responsibility for the contract to the National Capitol Region. Id., Ex. 1 (Foley Decl.) ¶ 18.

The DOJ subsequently complained about ongoing problems with Wackenhut's performance.  Id., Ex. 2  (Foley Dep.) at 98.  The most significant complaints pertained to (1) locations that Wackenhut failed to man; (2) inadequately trained personnel; and (3) inadequately equipped personnel.  Id., Ex. 2  (Foley Dep.) at 97, 99, Ex. 3  (Harris Dep.) Attach. 16 (Email from Glenn Emig to Larry Luper).

To address the DOJ's complaints, beginning in November 2003, Wackenhut's Chief Operating Officer, David Foley, convened almost daily telephone calls with the plaintiff and other Wackenhut personnel.  Id., Ex. 2  (Foley Dep.) at 102-103, Ex. 3  (Harris Dep.) at 108-109, 113-114, 118-119.  His goal was to monitor National Capitol Region's progress in addressing the DOJ's concerns.  Id., Ex. 2  (Foley Dep.) at 95-96, Ex. 3  (Harris Dep.) at 108-109.  The plaintiff

alleges that Wackenhut officials made the following offensive comments about him during those telephone calls.  Id., Ex. 3  (Harris Dep.) at 108-112.

### (a)     Mr. Luper's Porky Pig Imitation

The plaintiff claims that during a conference call in which other Wackenhut employees participated, Mr. Luper made fun of the plaintiff's stutter by imitating how the cartoon character Porky Pig spoke,[13] Def.'s Mem., Ex. 3  (Harris Dep.) at 109-110, 132, 136, which the plaintiff found embarrassing.  Id. at 110.  According to the plaintiff, Mr. Luper made fun of the plaintiff's stutter once before in the same manner during a telephone call involving just the two of them.  Id. 121-126.  The plaintiff contends that he responded to the second Porky Pig imitation by saying "this isn't going to work" and ending the conversation, without explaining what he meant by his response to Mr. Luper's imitation.  Id. at 126, 127-28.

### (b)     Mr. Foley's Laughter

The plaintiff contends that Mr. Foley laughed at him when he tried to explain the problems with the Justice Department project.[14]  Id. at 110-111.  This conduct allegedly occurred

---

[13]  The parties dispute whether the plaintiff spoke to Mr. Long about the comment or made a complaint about it.  The defendant contends that neither occurred.  Def.'s Mem., Ex. 3  (Harris Dep.) at 117, 118, 128, 131.  On the other hand, the plaintiff asserts that the record demonstrates that he contacted Mr. Long on more than one occasion to complain about the comment.  The plaintiff points out that Mr. Long noted: "I think it had to do with Larry Luper, complaining that Larry Luper had done something he didn't like and yelled at him or wasn't supporting him."  Pl.'s Opp'n., Ex. 1 at 171, L. 8-25.

[14] The record reflects that the plaintiff can cite no facts that suggest that his race was a factor for Mr. Foley's alleged conduct.
  Q:      Do you have any evidence or information that leads — that supports a conclusion that Mr. Foley laughed in response to what you said because you are a black person?
  A:      I have no way of knowing what he was thinking.
  Q:      Do you have any evidence or information that points one way or another as to what he was thinking?
  A:      I do not know what he was thinking.

(continued...)

during conference telephone calls in which the plaintiff's staff and other Wackenhut employees

were participants.  Id.  During one of the conference calls, the plaintiff asked for Mr. Foley's fax

number, id. at 112, and Mr. Foley allegedly responded with a laugh and the following taunt:

"What are you going to send to me?  What are you going to send to me?"[15]  Id. at 111-112, 143,

145.

       **(c)**    **Mr. Faulkner's Wager**

    According to the plaintiff, following Mr. Foley's taunt, Mr. Faulkner made a wager

regarding the plaintiff:  "I'll bet you he isn't going anywhere.  The money is too good."[16]   Id. at

---

[14](...continued)
Def.'s Mem., Ex. 3  (Harris Dep.) at 140.

   [15] Again, the plaintiff is unable to cite any facts that suggest that Mr. Foley did so because he is
black.

      Q:     [A]re you aware of any evidence or information that supports a conclusion that Mr.
              Faulkner — pardon me — Mr. Foley asked you the questions that he asked you, what are
              you going to send to me, what are you going to send to me, because you are black?
      A:     I have no idea what he was thinking.

Def.'s Mem., Ex. 3  (Harris Dep.) at  145.

   [16] Once again, the plaintiff is not aware of any facts that suggest that his race factored into the
wager.

      Q:     Do you have any evidence or information that supports a conclusion that Mr. Faulkner
              made the comment that he made, I bet he won't leave because the money is too good,
              because you are black?
      A:     I have no idea what he was thinking.
      Q:     You have no evidence or information that supports a conclusion that he said that because
              you are black?
      A:     I don't know what he was thinking.
      Q:     Is the answer to my question yes, you have no evidence or information?
      A:     I have no information.
      Q:     Or evidence, is that correct?
      A:     Or evidence.

Def.'s Mem., Ex. 3  (Harris Dep.) at  142-143.

15, 112, 120, 141-142.

### G.     Wackenhut's Decision to Transfer the Plaintiff

When Mr. Foley became Wackenhut's Chief Operating Officer in October 2003, he

began to explore with Mr. Long ways to improve the performance of the National Capitol

Region.  Def.'s Mem., Ex. 2  (Foley Dep.) at 132, 134, 143-144, 187-188; Ex. 4 (Long Dep.) at

85, 97, 99, 99, 122.  And, as Wackenhut worked through how to improve its performance on the

Department of Justice contract, Mr. Long and Mr. Foley concluded that the National Capitol

Region needed new staffing and greater organization.  Id.  They also concluded that the plaintiff

was not sufficiently organized to manage the Justice Department contract.  Id.

In Mr. Long's judgment, near the end of the plaintiff's tenure with Wackenhut, the

plaintiff had reached the point where he was losing his effectiveness as Vice President and

General Manager of the National Capitol Region, a point Mr. Long testified all employees in

such positions at Wackenhut inevitably reach.  Id., Ex. 4 (Long Dep.) at 60-61.  As a result of the

alleged decline in the plaintiff's performance, Mr. Long and Mr. Foley decided to (1) transfer[17]

the plaintiff to another corporate vice presidential position:  Vice President of Marketing for the

Washington, D.C. area; and (2) make him General Manager of the contract that Wackenhut was

hoping to secure with the State Department.[18]  Id., Ex. 2  (Foley Dep.) at 126-129,131-132, 144-

145, 187-188; Ex. 4 (Long Dep.) at  85-86, 101.  As Vice President of Marketing for the

---

[17] The parties dispute whether this reassignment would have been a lateral transfer or a demotion.  The defendant asserts that the transfer was a lateral move, Def.'s Mem. at 18, while the plaintiff asserts that the position was a demotion, Pl.'s Opp'n., Ex. 2 (Harris Dep.) at 147.

[18] According to the plaintiff, the position would consist of writing the proposal for the State Department contract without any supervisory capacity, and that this was "[a] step backwards."  Pl.'s Opp'n., Ex. 3 (Harris Dep.) at 147.

Washington, D.C. area, Wackenhut envisioned that the plaintiff would report to Wackenhut's

Executive Vice President for Business Development and Marketing and serve as an extension of

the corporate marketing and business development office.[19] Id., Ex. 2  (Foley Dep.) at 126-127,

129; Ex. 4 (Long Dep.) at 89, 94, 96.  In this new position, the plaintiff would work out of

Wackenhut's corporate office in downtown Washington, D.C., Id., Ex. 2  (Foley Dep.) at 129,

and his staff would consist of the corporate staff in Wackenhut's Palm Beach Gardens

headquarters and a small office staff in Washington, D.C.  Id. at 129- 130.   Wackenhut

considered the new position an important assignment, and based upon the Company's familiarity

with the plaintiff's work, it assumed he would perform the job well.  Id. at 144-145; Ex. 4 (Long

Dep.) at 162, 166.  Additionally, Wackenhut needed an official to fill the void that had been

created when the Company directed the person (Mr. Brinkley) previously responsible for

marketing in the District of Columbia to focus his attention on the international arena.  Id., Ex. 2

(Foley Dep.) at 141- 142.  Wackenhut believed that the State Department project it anticipated

acquiring would have been a great assignment for the plaintiff to manage, given its nation-wide

scope and the responsibility for supervising over 750 people.  Id., Ex. 2 (Foley Dep.) at 133; Ex.

3 (Harris Dep.) at 266-269.

Mr. Foley first discussed the possible transfer with the plaintiff at the November 2003

general mangers' conference, before the plaintiff presented the proposed compensation

memorandum for the National Capitol Region staff.  Id. Ex. 2 (Foley Dep.) at 154; Ex. 3 (Harris

Dep.) at 238, 240, 242, 247, 250.  On December 4, 2003, Mr. Foley told the plaintiff that

---

[19] The parties dispute whether the plaintiff would have been responsible for developing
Wackenhut's Washington, D.C. area market.  Compare Def.'s Mem., Ex. 2  (Foley Dep.) at 126-28,
147 with Ex. 3 (Harris Dep.) at 252, 267, 271; see also Pl.'s Statement of Disputed Facts at ¶ 101.

Wackenhut had decided to proceed with the transfer.  Id., Ex. 2  (Foley Dep.) at 154-155; Ex. 3

(Harris Dep.) at 261-262 264 & Attach. 15 (Memorandum from the Plaintiff to James L. Long

dated December 6, 2003 ("Resignation Memorandum").

     Feeling that the reassignment was "a huge step backwards," id., Ex. 3 (Harris Dep.) at

265, the plaintiff told Mr. Foley that he was considering submitting his resignation, id., Ex. 3

(Harris Dep.) at 263, 265, 271-272.  Mr. Foley encouraged him to remain with Wackenhut,

accept the new job, and to do nothing to jeopardize his year-end bonus.  Id.  Mr. Foley also

explained that, with the acquisition of the anticipated State Department contract, Wackenhut

would promote the plaintiff to the position of Senior Vice President and Program Manager.  Id.

     The plaintiff said that he would think about what Mr. Foley had stated.  Id., Ex. 3  (Harris

Dep.) at 265.  However, two days later, on December 6, 2003, the plaintiff faxed a letter to

Wackenhut in which he announced his resignation, said that he had signed himself out on leave

through his effective resignation date, and reported that he would be available to communicate

with Wackenhut only by facsimile and by mail.  Id., Ex. 3  (Harris Dep.) Attach. 15 (Resignation

Memorandum); Ex. 4 (Long Dep.) at 164-165.  The parties dispute whether the plaintiff's

resignation constituted an abandonment of his job or amounted to a constructive discharge.  Id.

Specifically, Wackenhut asserts that the plaintiff "abandoned his job" leaving the company "to

scramble to cover the duties that he discharged," Id., Ex. 1 (Foley Decl.) ¶ 19), after Mr. Foley

found the plaintiff's faxed resignation on the morning of December 8, 2007, along with the keys

for the company car assigned to the plaintiff, his pager, and other company belongings, id., Ex. 2

(Foley Dep.) at 219, 221.

     Wackenhut contends that the plaintiff is not the only senior employee whom Wackenhut

has transferred to meet the Company's business needs, having also transferred white employees. Id., Ex. 2 (Foley Dep.) at 182, 186; Ex. 4 (Long Dep.) at 164, 167, 169.  And, at least one white Vice President – Bud Isom – followed a path similar to the one that Wackenhut allegedly contemplated for the plaintiff, moving from the position of Senior Vice President and General Manager at Wackenhut's Rocky Flats project to the position of Vice President for Marketing and Business Development and then back to the position of Senior Vice President and General Manager at Wackenhut's Savannah River location. Id., Ex. 1 (Foley Decl.) ¶ 20, Ex., 2  (Foley Dep.) 184-185.

**H.      Wackenhut's Notification to the Defense Industrial Security Clearance Office**

        Sometime around December 9, 2003, Wackenhut notified the Defense Industrial Security Clearance Office that the plaintiff no longer worked for the Company.  Id., Ex. 1 (Foley Decl.) ¶ 21 & Attach. B (Clearance Change Notification).  "Consistent with the National Industrial Security Program . . . Operating Manual, Wackenhut routinely dispatches such a notice whenever an individual with a security clearance, regardless of race, leaves Wackenhut's employ." Id., Ex. 1 (Foley Decl.) ¶ 22 & Attach. C (National Industrial Security Program Operating Manual excerpt).

**I.      Plaintiff's New Position**

        Within days after the plaintiff's departure from Wackenhut, he obtained a position as Senior Vice President of Metro Operations, with another security contractor, SecTek, Inc.  Id., Ex. 3  (Harris Dep.) at 308-309 & Attach. 21 (Letter from Wilfred Blood to Plaintiff dated December 12, 2003) ("Offer Letter").  SecTek paid the plaintiff $120,000 per year, nearly $25,000 per year greater than his last Wackenhut salary.  Id. Also, after a year at SecTek, the

plaintiff would be eligible to receive up to a 20% performance-based bonus.[20]  Id., Ex. 3 (Harris

Dep.) Attach. 21 (Offer Letter).

## J.      Wackenhut's Anti-discrimination Policies and Procedures

            Wackenhut has adopted anti-discrimination and anti-harassment policies.  Id.,  Ex. 1

(Foley Decl.) ¶ 3 & Attach. A (Equal Employment Opportunity provision of Wackenhut's

Human Resources Manual).  Pursuant to these policies, employees with discrimination or

harassment complaints may raise such complaints with their supervisor, management, or

Wackenhut's Human Resources Department.  Id., Ex. 1 (Foley Decl.) ¶ 3 & Attach. A, 5-6.

## K.      The Present Lawsuit

            On November 12, 2004, the plaintiff filed this action in the Superior Court of the District

of Columbia alleging that the defendant subjected him to (1) a hostile work environment because

of his race; (2) disparate treatment based on his race; (3) retaliation; and (4) constructive

discharge of his employment.  Complaint ("Compl.") at 14-16.  Specifically, the plaintiff

contends that the defendant subjected him "to a hostile work environment and constructively

discharged him by discriminatorily demoting him and depriving him of his supervisory

responsibilities over approximately 1,000 employees and retaliating against him for opposing

senior management's discriminatory treatment of the defendant's African American employees."

Notice of Removal ¶ 2; Compl. at 2.  Subsequently, this matter was removed by the defendant to

this Court on December 9, 2004 pursuant to 28 U.S.C. §1332(c)(1) (2000).  Notice of Removal.

---

[20] When applying for the job, the plaintiff told SecTek that he left Wackenhut "to explore other opportunities."  Def.'s Mem., Ex., 3 (Harris Dep.) at 307-308 & Attach. 20 (Employment Application).

18

## II.  STANDARD OF REVIEW

District Courts will grant a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a Rule 56(c) motion, the Court must view the evidence in the light most favorable to the non-moving party.  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving party, however, cannot rely on "mere allegations or denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal quotation marks omitted), and "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted). Simply put, "conclusory allegations unsupported by factual data will not create a triable issue of fact." Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation marks and citations omitted).  Rather, to withstand a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "[T]here is no [genuine] issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party," Anderson, 477 U .S. at 249 (citation omitted), and if the Court concludes that the evidence adduced by the non-moving party "is merely colorable . . . or is not significantly probative," id.

19

(citations omitted), or if the non-moving party has otherwise "failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986), then the moving party is entitled to summary judgment.  Finally, "[a]ll supporting and opposing affidavits [submitted in connection with a Rule 56(c) motion] shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

## III.  LEGAL ANALYSIS

### A.       Disparate Treatment Claim Based on Race

#### 1.      The Defendant's Statute of Limitation Defense

The defendant contends that the plaintiff's "discrimination claim is time-barred to the extent that he premises it upon conduct that occurred before November 12, 2003[,] . . . [including] (1) Wackenhut's decision to assign [the] [p]laintiff to the Camp Springs office; (2) Wackenhut's decision to assign [the] [p]laintiff previously driven cars; (3) Wackenhut's alleged decision not to sponsor exclusive club and organization membership for [the] [p]laintiff; (4) Wackenhut's requirement that [the plaintiff] ask for permission to purchase small items; and (5) Wackenhut's holiday budget allocations." Def.'s Mem. at 24.  In opposition, the plaintiff responds that "[the] [d]efendant's actions about which the [p]laintiff complains as part of his hostile work environment claim were part of a continuing violation,"  Pl.'s Opp'n at 17, and that the "[d]efendant has failed to demonstrate that [the] [p]laintiff's hostile work environment claim is time-barred."  Id.  Interestingly, the plaintiff does not address whether the challenged actions are time-barred in regards to his race discrimination claim.  Id.  Instead, the plaintiff only

addresses the statute of limitations challenge to his hostile work environment claim.  Id. at 16-19.

For the reasons set forth below, the Court finds that the plaintiff's race discrimination claim is

time-barred as to acts that occurred before November 12, 2003.

A complaint asserting a claim under the Human Rights Act must be filed "within one year

of the unlawful discriminatory act, or the discovery thereof." D.C. Code § 2-1403.16(a) (2001).

The plaintiff filed this action on November 12, 2004.  Therefore, only alleged discriminatory

actions attributed to the defendant after November 12, 2003, are timely unless the continuing

violation theory applies.  See Milton v. Weinberger, 645 F.2d 1070 (D.C. Cir.1981); Shehadeh v.

C & P Telephone Co., 595 F.2d 711 (D.C. Cir.1978).  For several reasons, the Court finds that

the continuing violation theory is not applicable here.

First, "[a] key premise of the continuing violation theory . . . is that the limitations period

should not begin until a reasonable person would have been aware that [his] rights were

violated." Campbell v. Nat'l Educ. Ass'n, 254 F.3d 315, 2000 WL 1584589 at *2 (D.C. Cir.

2000); see also Taylor v. FDIC, 132 F.3d 753, 765 (D.C. Cir. 1997) ("For statute of limitations

purposes, a continuing violation is 'one that could not reasonably have been expected to be made

the subject of a lawsuit when it first occurred because its character as a violation did not become

clear until it was repeated during the limitations period[.]'" (citation omitted)); Dasgupta v. Univ.

of Wisc. Bd. of Regents, 121 F.3d 1138, 1139 (7th Cir. 1997).  Here, most of the alleged

discriminatory actions, such as the defendant's decision to place the plaintiff at the Camp Springs

office and to assign him previously driven vehicles, occurred approximately five to six years

before the plaintiff filed this action.  The plaintiff has not alleged that he was unaware that the

actions were discriminatory when they occurred or that post-action facts came to light which

transformed his perception of events that previously seemed non-discriminatory.  In short, the plaintiff has not shown how the actions he now complains could not be understood as actionable at the time of their occurrence.  To the contrary, the plaintiff testified to his awareness and reactions to the events when they occurred.  See Compl. ¶¶ 18, 21, 26, 28; Def.'s Mem., Ex. 3 (Harris Dep.) at 85, 87, 90-95, 99-100, 102, 108-10, 115, 118-19, 195.  Thus, a reasonable person would have been aware that his rights had allegedly been violated long before the one-year limitations period would have expired.  Campbell, 2000 WL 1584589 at *2; Taylor, 132 F.3d at 765 (rejecting a retaliation claim because the alleged wrongful act "amply manifested itself as a possible retaliation from the start").

Second, as noted below, Title VII jurisprudence is persuasive authority for the conclusion that the alleged discriminatory actions do not support application of the continuing violation theory under the Human Rights Act.  Daka v. Breiner, 711 A.2d 86, 94 (D.C. 1998) ("in deciding issues arising under the [Human Rights Act], [the District of Columbia Court of Appeals] consistently relies upon decisions of the federal courts in Title VII cases as particularly persuasive authority").  The Court therefore shall reference Title VII jurisprudence where appropriate.  That jurisprudence includes Nat'l R.R. Passenger Corp. v. Morgan, where the Supreme Court rejected applicability of the continuing violation doctrine in cases involving discrete acts of discrimination in assessing the timeliness of an employee's claims under Title VII. 536 U.S. 101, 113 (2002); see also Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, ___, 127 S. Ct. 2162, 2169 (2007) ("[C]urrent effects alone cannot breathe life into prior uncharged [act of] discrimination [outside of the statutory period for filing a claim].").  The Supreme Court held in Morgan that "discrete discriminatory acts are not actionable if time

22

barred, even when they are related to acts alleged in timely filed charges." Id.  The Court further

explained that a discrete discriminatory act occurs "on the day it happened," and gave as

examples of such acts: termination, failure to promote, denial of a transfer, and refusal to hire.

Id. at 110, 114.  The Supreme Court contrasted claims of discrete acts of discrimination with

hostile work environment claims, for which the continuing violation doctrine remains available,

because hostile work environment claims by "[t]heir very nature involve[ ] repeated conduct"

that "occur[] over a series of days or perhaps years and, in direct contrast to discrete acts, a single

act of harassment may not be actionable on its own." Id. at 115.  Thus, outside the hostile work

environment arena, "[e]ach discriminatory act starts a new clock for filing charges alleging that

act." Id. at 113. Therefore, "[e]ach incident of discrimination . . . constitutes a separate actionable

'unlawful employment practice.'" Id. at 114.  Accordingly, the challenged discriminatory actions

that occurred over one year prior to November 12, 2003, are time-barred and not actionable as

race discrimination claims under the Human Rights Act.

**2.      The Plaintiff's Discrimination Claim**[21]

The Human Rights Act, like Title VII, prohibits certain discriminatory practices "[b]y an

employer."  D.C. Code § 2-1402.11(a)(1) (2001).[22]  The legal standard for establishing a

---

[21] The following acts of alleged discrimination will not be addressed as they are time-barred by the applicable statute of limitations: (1) that the plaintiff was forced to work in substandard facilities that were plagued by challenges, including, but not limited to, faulty swage lines, non-working elevators, freezing and breaking pipes; and (2) that the defendant subjected the plaintiff to continuous harassment, racist jokes, and discriminatory comments.

[22] Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), or "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee," 42 U.S.C. § 2000e-2(a)(2), based on a protected characteristic.

discrimination claim under the Human Rights Act is "substantially similar[]" to the standard

under Title VII.  Carpenter v. Fed. Nat'l Mortg. Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (applying

the same test for discrimination for Human Rights Act allegations as would apply to Title VII

allegations based on the "substantial similarly" between the two laws); see also Regan v. Grill

Concepts-DC., Inc., 338 F. Supp. 2d 131, 134 (D.D.C. 2004) ("This Court, too, will consider [the

p]laintiff's claims under [Human Rights Act] utilizing the case law developed for suits brought

under Title VII."); MacIntosh v. Bldg. Owners & Mgrs. Assoc. Int'l, 310 F. Supp. 2d 240, 244

(D.D.C. 2004) ("In analyzing a claim of employment discrimination under the [Human Rights

Act], courts look to Title VII and its jurisprudence."); Hollins v. Fed. Nat'l Mortgage Ass'n, 760

A.2d 563, 571 (D.C. 2000) (noting that in considering claims brought under the Human Rights

Act, the D.C. Court of Appeals applies the familiar burden-shifting test developed by the

Supreme Court for Title VII cases); Knight v. Georgetown Univ., 725 A.2d 472, 478 n. 5 (D.C.

1999) (noting that the same body of law is used to construe both provisions); Daka v. Breiner,

711 A.2d at 94 ("[in deciding issues arising under the [Human Rights Act],[the D.C. Court of

Appeals] consistently relies upon decisions of the federal courts in Title VII cases as particularly

persuasive authority").  Where, as here, the plaintiff has not proffered any direct evidence of

intentional discrimination,[23] his race discrimination claim is evaluated pursuant to the burden-

shifting framework first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-

805 (1973).  Carpenter, 165 F.3d at 72 (applying the McDonnell Douglas test "[i]n interpreting

---

[23]  "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the
particular fact in question without any need for inference. Such evidence includes any statement or
written document showing a discriminatory motive on its face." Lemmons v. Georgetown Univ. Hosp,
431 F. Supp. 2d 76, 86 (D.D.C. 2006) (Walton, J.) (internal quotation marks, citations, and ellipsis
omitted) (emphases in original). The plaintiff does not argue, nor could he, that the factual record in this
case contains any such direct evidence of discrimination.

[the D.C.] Human Rights Act . . . given the substantial similarity between [Title VII] and the D.C. Human Rights Act").  Under this framework, the plaintiff bears the initial burden of "establish[ing] a prima facie case of discrimination by a preponderance of the evidence."  Id. (internal quotation marks and citation omitted).  As is the case under Title VII, in order "to state a prima facie case of disparate treatment discrimination" under the Human Rights Act, "the plaintiff must establish that (1) []he is a member of a protected class, (2) []he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination", that is, an inference that his employer took the action because of his membership in the protected class.  Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).

Regarding the first prong of the McDonnell Douglas framework, it is undisputed that the plaintiff is a member of a protected class, as he is African-American.  Compl. ¶ 1.

As to the second prong of a prima facie case for discrimination, the only adverse employment allegation that survives the defendant's statute of limitations challenge is the plaintiff's claim that the defendant demoted him from Vice President and General Manager to what the plaintiff characterizes as a contract proposal writer position, thereby stripping him of his supervisory authority, separating him away from his staff, and asking him to report to one of his peer colleagues who had earlier allegedly called him a "black b[i]tch." Pl.'s Opp'n at 26; Compl. ¶¶ 16-25.  The parties dispute whether the plaintiff's imminent transfer out of the National Capitol Region Vice President and General Manager position to the new position would have been a lateral transfer not amounting to an actionable claim or actionable as a demotion.

"An employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privilege of employment or future employment

opportunities such that a trier of fact could find objectively tangible harm." Brown v. Brody, 199

F.3d at 457. "A tangible employment action constitutes a significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." Brown v. Brody, 199

F.3d at 456 (comparing Crady v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th

Cir. 1993) (where another Circuit opined that "[a] materially adverse change might be indicated

by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices that might be unique to a particular situation"), with Flaherty v. Gas Research

Institute, 31 F.3d 451, 456 (7th Cir. 1994) (where the same Circuit concluded that a "bruised

ego" is not enough); Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 (6th Cir. 1996)

(where it was concluded that a demotion without change in pay, benefits, duties, or prestige did

not amount to adverse action) and Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th

Cir. 1994) (where it was held that reassignment to more inconvenient job held insufficient)); see

also Broderick v. Donaldson, 437 F.3d at 1226, 1233 (D.C. Cir. 2006); Taylor v. Small, 350 F.3d

1286, 1293 (D.C. Cir. 2003) (both quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761

(1998) (where Court stated that an adverse employment action occurs where there is "a

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing significant change in

benefits".). Therefore, even a lateral transfer that results "in withdraw[al] of an employee's

supervisory duties, for example, constitutes an adverse employment action," as does a

"reassignment with significantly different responsibilities." Czekalski v. Peters, 475 F.3d 360,

364 (D.C. Cir. 2007) (citation omitted).  However, "[m]ere idiosyncracies of personal

preference" are "not sufficient to state an injury." Brown, 199 F.3d at 457 (citation omitted); see

also Holcomb v. Powell, 433 F.3d at 902 (stating that "'purely subjective injuries,' such as

dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse

actions . . .").

      Here, the Court finds that regardless of whether the plaintiff's impending reassignment is

characterized as a lateral transfer or a demotion, the determination of whether it amounted to an

adverse employment action raises a genuine issue of material fact that must be submitted to a

jury.  The plaintiff contends that the ordered transfer was an adverse action because his

supervisory responsibilities would have been reduced, Pl.'s Opp'n, Ex. 2 (Harris Dep. II) at 147,

and it is not disputed that the plaintiff would no longer have been responsible for supervising the

National Capitol Region staff. Pl.'s Mot., Ex. 1 (Deposition of Foley) (Foley Dep. II) at 117,

119.[24]   In the new position as the Vice President for Marketing and Business Development for

the District of Columbia area, the plaintiff's primary responsibility would have been writing

contract proposals, specifically the proposal for the upcoming bid on the State Department

contract. Pl..'s Mem., Ex. 2 (Harris Dep. II) at 147; Ex. 4 (Long Dep.) at 89, 94, 96.  However,

the defendant has provided evidence that it allegedly contemplated promoting the plaintiff to

Senior Vice President and Program Manager if it won the State Department project based on its

bid proposal that the defendant wanted the plaintiff to write, and in that position the plaintiff

---

[24] As Vice President and General Manager of the National Capitol Region, the plaintiff was also responsible for, inter alia: (1) the contracts that were assigned to the National Capitol Region, (2) the recruiting of personnel and staffing of those contracts, (3) the training and equipping of those employees, (4) personnel and payroll administration, and (5) supervising the project manager of a project and his or her staff, id. at 118, and this amounted to the supervision of approximately 600 employees in the National Capitol Region position, Pl.'s Mot., Ex. 1  (Foley Dep. II) at 119.

"[p]otentially" would have "had nationwide responsibility for running [the] project," supervising about fifteen to seventeen persons, albeit with the same compensation and benefits as the plaintiff would have received as a contract proposal writer.  Def.'s Mem., Ex. 3 (Harris Dep.) at 263-265, 267-68, 273.   Nonetheless, the plaintiff contends that his transfer to the new position would have been "a step backwards."  Id. at 265.  The defendant disputes the plaintiff's claim that the transfer was an adverse action, noting that the plaintiff would have served as an extension of the corporate marketing and business development office, responsible for developing the District of Columbia market, and his staff would have consisted of the corporate staff in Florida and a small staff in the District of Columbia; moreover, he would have received the same salary and benefits that he earned as Vice President and General Manager of the National Capitol Region.  Id., Ex. 2 (Foley Dep.) at 124, 126-127, 129-130, Ex. 3 (Harris Dep.) at 268 & Attach. 12 (Personnel Action Change Form, dated November 3, 2003, Ex. 4 (Long Dep.) at 89, 94, 96.

"Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 71 (2006) (internal quotation marks and citations omitted). The determination of whether a transfer or reassignment constitutes an adverse employment action "is generally a jury question". Czekalski, 475 F.3d at 365 (citing Burlington Northern, 548 U.S. at 70).  If a reasonable juror could find that the reassignment constitutes an adverse employment action, "the court may not take that question away from the jury."  Id.  Here, it is not beyond the pale that a reasonable jury could find it difficult to reconcile the defendant's insistence that its

28

intended transfer of the plaintiff to the position of Vice President of Marketing was an equally important position, with the defendant's acknowledgment that it intended to transfer the plaintiff to a different position because he was not performing well as Vice President and General Manager of the National Capitol Region. Id., Ex. 2 (Foley Dep.) at 126-129, 131-132, 144-145, 187-188, Ex. 4 (Long Dep.) at 60-61, 85-86, 101. Thus, viewing the facts in the light most favorable to the plaintiff, the Court cannot find as a matter of law that the proposed transfer of the plaintiff was not an actionable lateral transfer and therefore did not constitute an adverse employment action. Accordingly, there is a genuine issue of material fact as to whether the new position amounted to an adverse action by materially affecting the terms, conditions, or privilege of the plaintiff's employment. Therefore, the defendant's motion for summary judgment as to the plaintiff's race discrimination claim based on his impending transfer must be denied.

As to the plaintiff's allegations concerning the racial jokes and comments made to him or in his presence by the defendant's employees, the Court finds that the plaintiff has not presented sufficient evidence to establish that the jokes or comments rose to the level of adverse employment actions. The alleged racial jokes and comments that are not time-barred include: (a) Mr. Long's ghetto remark to another African-American executive; (b) Mr. Luper's "Porky Pig" imitation; (c) Mr. Foley's laughs and taunts; (d) Mr. Foley's request that the plaintiff identify what he planned to fax to Mr. Foley and (e) Mr. Faulkner's wager about the defendant not terminating his employment. All of these jokes and comments allegedly occurred sometime in November 2003. Def.'s Mem., Ex. 3 (Harris Dep.) at 114, Compl. ¶ 18, Ex. 2 (Foley Dep.) at 102-03. As previously noted, "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privilege of

29

employment or future employment opportunities such that a trier of fact could find objectively

tangible harm." Wiley v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007) (citation omitted). "A

tangible employment action constitutes a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits." Brown v. Brody, 199 F.3d at 456. Here, the plaintiff's

allegations that he "often heard racist jokes and other statements that were patently offensive" are

not sufficient to establish that such alleged jokes and comments affected the terms, conditions, or

privilege of his employment. Id.; see also Faragher v. City of Boca Raton, 524 U.S. 775, 787

("'[M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an

employee' would not sufficiently alter terms and conditions of employment to violate Title VII.")

(quoting Rogers v. EEOC, 454 F.2d 234 (5th Cir. 1971)); Barbour v. Browner, 181 F.3d 1342,

1348 (D.C. Cir. 1999) ("'[S]imple teasing, offhand comments, and isolated incidents' . . . [are

distinguishable] from the serious discriminatory conduct that violates Title VII."); Hall v. Giant

Food, Inc., 175 F.3d 1074, 1079-80 (D.C. Cir. 1999) (finding no age discrimination under Title

VII where the plaintiff offered isolated discriminatory statement by person unconnected to

challenged employment decision). Accordingly, the defendant's motion for summary judgment

as to the plaintiff's race discrimination claim based on the alleged racial jokes and comments

must be granted.

**3.      The Plaintiff's Hostile Work Environment Claim**

The plaintiff contends that the defendant subjected him to a hostile work environment by:

(1) consistently subjecting him to derogatory statements and offensive remarks, i.e., (1) Mr.

Luper's "ohm boy" riddle, Mr. Gallagher's "black bitch" remark, Mr. Long's ghetto remark to

another African-American executive, Mr. Luper's "Porky Pig" imitation, Mr. Foley's laughs and

taunts, and Mr. Faulkner's wager; (2) assigning him to work in the Camp Springs office that was

in poor condition and was not properly maintained; (3) assigning him previously driven

automobiles while white supervisors were assigned superior quality vehicles; (4) requiring him to

ask permission to make small purchases while affording similarly situated white employees the

freedom to purchase what they needed to perform their duties; and (5) allocating a smaller

amount of funds to him for his holiday budgets than was allocated to his white counterparts.

Compl. ¶¶ 15-19, 21, 23-24, 26-28; Pl.'s Opp'n at 19-23.  In response, the defendant argues that

the plaintiff's hostile work environment claim must fail because: (1) "he cannot satisfy his

burden of proving that race was a factor in most of the conduct upon which he relies," Def.'s

Mem. at 26, (2) "Mr. Luper's ohm boy riddle and Mr. Gallagher's black bitch remark" are

isolated incidents that are insufficient, as a matter of law, to support a hostile work environment

claim, id. at 27, and (3) to the extent that the alleged discriminatory remarks created a hostile

work environment, "[the] [p]laintiff cannot demonstrate that Wackenhut failed to restrain them,"

id.

An employer may not create or condone a hostile or abusive work environment for any

reason that is based on a statutorily protected status such as race.  Meritor Sav. Bank, FSB v.

Vinson, 477 U.S. 57, 64 (1986).  To establish a prima facie case of hostile work environment, the

plaintiff must show that: "(1) []he is a member of a protected class; (2) []he was subjected to

unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status;

(4) the harassment affected a term, condition, or privilege of employment; and (5) the employer

knew or should have known about the harassment, but nonetheless failed to take steps to prevent

it." Lester v. Natsios, 290 F. Supp. 2d 11, 22 (D.D.C. 2003); see also Davis v. Coastal Int'l Sec.,

275 F.3d 1119, 1122 (D.C. Cir. 2002); Crenshaw v. Georgetown University, 23 F. Supp. 2d 11,

15 (D.D.C. 1998); Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), aff'd 1998 WL 9101

(D.C. Cir. June 30, 1998); Lively v. Flexible Packing Ass'n, 830 A.2d 874, 888 (D.C. 2003);

Daka, Inc. v. Breiner, 711 A.2d 86, 92 (D.C. 1998).

"A hostile work environment claim is composed of a series of separate acts that

collectively constitute one unlawful employment practice." Nat'l R.R. Passenger Corp. v.

Morgan, 536 U.S. 101, 117 (2002) (internal quotation marks omitted). A work environment is

considered "hostile" under Title VII only when it is "permeated with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs.,

Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993))

(internal quotation marks omitted). In determining whether a work environment is sufficiently

"hostile" to support a Title VII claim, the Court must look at the totality of circumstances,

including "the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." Harris, 510 U.S. at 23.  Therefore, the "conduct must be

extreme to amount to a change in the terms and conditions of employment." Faragher v. Boca

Raton, 524 U.S. 775, 788 (1998) (emphasis added). Thus, "offhand comments[ ] and isolated

incidents (unless extremely serious)" do not meet this standard.  Id.  By ensuring that "not all

abusive behavior, even when it is motivated by discriminatory animus, is actionable," Stewart v.

Evans, 275 F.3d 1126, 1133 (D.C. Cir. 2002), "[t]hese standards are "sufficiently demanding to

ensure that Title VII does not become a general civility code." <u>Faragher</u>, 524 U.S. at 788 (quoting <u>Oncale</u>, 523 U.S. at 80) (internal quotation marks omitted). Moreover, Title VII "does not prohibit all forms of workplace harassment," but only harassment based on a person's membership in a class protected by Title VII. <u>Stewart</u>, 275 F.3d at 1133.

Again, it is undisputed that as an African-American, the plaintiff is a member of a protected class. It is also undisputed that the plaintiff was subjected to unwelcome harassment.[25] Def.'s Mem. Ex. 3 (Harris Dep.) 92-96, 99-102. It is, therefore, the three remaining elements of a hostile work environment claim that are in dispute.

                **A.**    **"Ohm Boy" Riddle; "Black B[i]tch" Remark; Ghetto Remark**

The plaintiff cannot show that all of the events he contends created a hostile work environment were the product of his race, and although he can demonstrate that Mr. Luper's "Ohm Boy" riddle and Mr. Gallagher's Black Bitch remark are attributable to his race, and Mr. Long's ghetto remark can arguably be placed in the same category, the plaintiff has not presented sufficient evidence to demonstrate that such harassment based on his race affected a term, condition, or privilege of his employment. Considered in the context of the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with [the plaintiff's] work performance," <u>Harris</u>, 510 U.S. at 23, the comments complained about by the plaintiff do not alone support a finding by the Court that his work environment was sufficiently hostile to become legally actionable. For the plaintiff to make this

---

[25] Proof that the plaintiff was subjected to unwelcome harassment is the testimony that he spoke to Mr. Luper and Mr. Gallagher about his dissatisfaction with their comments. Def.'s Mem., Ex. 3 (Harris Dep.) 92-96, 99-102.

showing, he must demonstrate that the comments were frequent and unreasonably interfered with his ability to perform his job. Holbrook v. Reno, 196 F.3d 255, 262 (D.C. Cir. 1999) ("To violate Title VII, workplace harassment must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and unreasonably interfer[e] with an individual's work performance." (internal quotations and citations omitted)). Although, the comments maybe considered offensive, rude, insensitive, and humiliating, the plaintiff has not shown how such remarks unreasonably interfered with his work performance. And to become actionable, the "conduct must be extreme to amount to a change in the terms and conditions of employment[,]" Faragher, 524 U.S. at 788 (emphasis added), and "simple teasing . . . [o]ffhand comments, and isolated incidents (unless extremely serious)" do not meet this standard, id. (citation and internal quotations omitted). Such is the situation here.

The plaintiff's claims fail because "a few isolated incidents of offensive conduct do not amount to actionable harassment." Stewart, 275 F.3d at 1134. The incidents of harassment must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Carter v. Greenspan, 304 F. Supp. 2d 13, 24 (D.D.C. 2004) (quoting Faragher, 524 U.S. at 787 n.1). Here, the record shows that Mr. Luper allegedly made his "Ohm Boy" riddle and Mr. Gallagher purportedly called the plaintiff a "black b[i]tch" during the fall of 2002, and Mr. Long is accused of making his ghetto remark during the 2003 manager's fall conference. Def.'s Mem., Ex. 3 (Harris Dep.) at 85-87, 90-91, 114. This evidence does not show that the comments made by Mr. Luper and Mr. Gallagher during the fall of 2002 and separated by a year of inactivity before the utterance of Mr. Long's remark over the course of the plaintiff's approximately five year career at Wackenhut can reasonably be considered

"continuous," Carter, 304 F. Supp. at 24, or "pervasive," Holbrook, 196 F.3d at 262.  Rather, the three comments are the sort of isolated acts that courts have consistently rejected as the basis for supporting Title VII claims.  See Sprague v. Thorn Ams., Inc., 129 F.3d 1355, 1366 (10th Cir. 1997) (five allegedly discriminatory comments over sixteen months, while "unpleasant and boorish," were insufficient to create a hostile work environment); Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (several discriminatory incidents spread over a seven-year period suggested the absence of a pervasive condition); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995) (nine incidents of verbal harassment over seven months insufficient for a sexual harassment claim); Akonji v. Unity Healthcare, Inc., Civ. No. 05-2101, 2007 WL 1207194, at *11, 2007 U.S. Dist. LEXIS 30060, at *35 (D.D.C. April 24, 2007) (five alleged acts of discrimination in two years as well as additional "inappropriate comments" insufficient to constitute hostile work environment).

Even if the alleged ghetto remark by Mr. Long can be considered racially motivated (substandard living conditions exist not only in African-American communities), it is not sufficient to establish a hostile work environment claim.  The statement, if made, was actually directed at someone other than the plaintiff, and "[w]hen racial statements are not made directly to [the] plaintiff, generally a hostile environment cannot be established." Nurriddin v. Goldin, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) (citations omitted), aff'd, sub nom. Nurriddin v. Griffin, 2007 WL 1126199, at *1 (D.C. Cir. Apr.16, 2007); see also Gleason v. Mesirow Fin. Inc., 118 F.3d 1134, 1144 (7th Cir. 1997) ("[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff."); Lester, 290 F. Supp. 2d at 31 ("[C]onduct directed at others rather than at plaintiff . . . is less indicative of a hostile work

environment.").  Accordingly, the plaintiff has not established that Mr. Luper's "Ohm Boy"

riddle, Mr. Gallagher's Black Bitch remark, and Mr. Long's ghetto remark created a hostile

environment that was "permeated with 'discriminatory intimidation, ridicule, and insult'" that is

sufficiently severe or pervasive to alter the conditions of the his employment and therefore

created an abusive working environment.  Harris, 510 U.S. at 21 (quoting Meritor Sav. Bank,

FSB, 477 U.S. at 65).

### B.    The Other Challenged Actions

The plaintiff is also unable to satisfy the third prong of the prima facie case of a hostile

work environment claim because he cannot establish that the remaining challenged acts occurred

because of his protected status.  Specifically, the plaintiff has not established that Mr. Luper's

Porky Pig imitation, Mr. Foley's laughs and taunts, and Mr. Faulkner's wager are attributable to

his protected status as an African-American.   In fact, the plaintiff cannot cite to any facts or

provide evidence that the comments made by Mr. Luper, Mr. Foley, and Mr. Faulkner were based

on his protected status.  Def.'s Mem., Ex. 3 (Harris Dep.) at 140, 142-43, 145; see Richardson v.

New York State Dep't of Corr. Serv., 180 F.3d 426, 440 (2d Cir. 1999) (claim for hostile work

environment failed where only three of fifteen alleged incidents had racial overtones); see also

Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345-46 (7th Cir. 1999) (hostile work

environment claim failed where evidence failed to establish that alleged harassing behavior was

motivated by discrimination); Jones v. Billington, 12 F. Supp. 2d at 12 (hostile work

environment claim failed where plaintiff had "not demonstrated that any of the conduct of which

he complains was related to his race.").  In addition, the plaintiff has not presented any evidence

showing that the defendant assigning him to work in the Camp Springs office; assigning

previously driven automobiles to him; requiring him to ask permission to make small purchases; and allocating to him a smaller amount of funds for the holiday related purposes were attributable to his status as an African-American. For instance, although the defendant contends otherwise, the record demonstrates that the plaintiff's car assignment, spending limitations, and holiday budget levels for National Capitol Region that were similarly imposed on his white successor. Def.'s Mem., Ex. 1 (Foley Decl. ¶¶ 13-7). Hence, the plaintiff cannot demonstrate that the challenged actions were attributable to his race.

Even assuming, however, that the plaintiff could establish that Messrs. Luper, Faulkner, and Foley's comments, his assignment to the Camp Spring office, his assignment to drive used automobiles, the imposed spending limitations and a reduced holiday budget were prompted by his protected status, the plaintiff cannot demonstrate that such conduct affected his work performance or was so pervasive that it made the plaintiff's work environment severely or pervasively abusive. A hostile work environment under Title VII must be based on "a series of separate acts that collectively constitute 'one unlawful employment practice', Morgan, 536 U.S. at 117," that are "so objectively offensive as to alter the 'conditions' of the victim's employment," Oncale, 523 U.S. at 81. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." Oncale, id. (quoting Harris, 510 U.S. at 21). And, the "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, 'considering all of the circumstances.'" Id. (quoting Harris, 510 U.S. at 23).

An examination of the totality of the circumstances in this case leads the Court to the

conclusion that the plaintiff has failed to set forth evidence sufficient to support his Title VII

hostile work environment claim.  In other words, the plaintiff's evidence, when viewed in its

totality, does not show that he was subjected to working in a workplace that was so permeated

"with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive

to alter the conditions of the [his] employment . . ." Barbour, 181 F.3d at 1347-48. Although the

plaintiff alleges a number of circumstances which he insists supports his hostile work

environment claim, the evidence regarding these incidents consists solely of his own conclusory

allegations that have no other factual support.  And, this is inadequate to sustain a hostile work

environment claim, as "the lack of credible or corroborative evidence offered with respect to the

claim[ ] [of a hostile work environment] justifies a ruling for the defendant." Id. (citing Greene v.

Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999);  Richard v. Bell Atl. Corp., 209 F. Supp. 2d 23, 35

(D.D.C. 2002)).  Accordingly, the defendant's motion for summary judgment as to the plaintiff's

hostile work environment claim must be granted.

### 4.      The Plaintiff's Retaliation Claim

The defendant contends that the plaintiff cannot establish a prima facie case of retaliation

because he cannot demonstrate that he engaged in protected activity prior to the asserted adverse

employment actions that are the basis for the retaliation claim.  Def.'s Mem. at 33.  Further, the

defendant asserts that "no reasonable employee would have found Wackenhut's decision to

transfer [the] [p]laintiff materially adverse." Id. at 34.  In response, the plaintiff argues that

"[c]ourts have applied an expansive view toward protected opposition[, i.e., activity,] in

retaliation cases, construing such claims broadly to include virtually any open allegation of

discriminatory behavior . . . Thus, [the plaintiff contends that the] [d]efendant's claim that [he]

did not engage in protected activity because he did not utter the 'magic word' 'discrimination'

must be rejected." Pl.'s Opp'n at 10.  Essentially, the plaintiff contends that the he "engaged in a

Title VII protected activity when he repeatedly sought equitable wages for his predominately

African-American staff."  Id. at 11; see also Pl.'s Mot. at 25-26.

"Under the [Human Rights Act], it is unlawful for an employer 'to retaliate against an

employee due to [his] opposition to any practice made lawful by the [Human Rights Act].'"

Regan, 338 F. Supp. 2d at 138 (quoting Grant v. May Dep't Stores Co., 786 A.2d 580 (D.C.

2001).  Therefore, "in order to state a prima facie case of retaliation, the plaintiff must

demonstrate: "that (1) []he engaged in statutorily protected activity; (2) h[is] employer took an

adverse personnel action against h[im]; and (3) a causal connection exists between the two."

Carney v. Am. Univ., 151 F.3d 1090, 1095 (D.C. Cir. 1998) (applying the same test for

retaliation claims made under the Human Rights Act as under Title VII).  If a plaintiff establishes

a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-

discriminatory reason for the employment action. See McDonnell Douglas, 411 U.S. at 802.  If

the defendant meets that burden, the plaintiff must demonstrate that the articulated reason is

pretextual. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53.

The Human Rights Act provides in relevant part that it is unlawful for an employer to

discriminate against an employee for opposing any practice made unlawful under this statute or

for making a charge under the statute.  D.C. Code § 2-1402.61(b).  In the related analysis with

respect to what type of action constitutes a "protected activity" under Title VII, the District of

Columbia Circuit stated that protected activity, in the context of a plaintiff's opposition to alleged

activity contravening the statute, includes any complaint so long as it "in some way allege[s]

unlawful discrimination, not just frustrated ambition;" in other words, "no 'magic words' are required." Broderick, 437 F.3d at 1232 (observing that "[n]ot every complaint garners its author protection under Title VII," and opining that the plaintiff's memorandum by itself may have not meet the standard because it "did not allege . . . that she was currently being discriminated [or retaliated] against"); see also Akonji v. Unity Healthcare, Inc., 517 F. Supp 2d 83, 94 (D.D.C. 2007) (applying Broaderick's Title VII analysis to retaliation claims brought under both Title VII and the Human Rights Act and finding that a complaint letter sent to a superior satisfied the standard). Despite the breath of activity protected by anti-discrimination statutes like Title VII and Human Rights Act, the Court finds that the plaintiff's concerns expressed to the defendant both verbally and by means of the written proposal for increased compensation for the National Capitol Region staff do not constitute "protected activity" under the Human Rights Act anti-retaliation provision for several reasons.

First, although during at least one conference call before the November 2003 General Manager's Conference, the plaintiff informed at least Mr. Faulkner, Wackenhut's Executive Vice President at the time, that he was concerned about the low wages being paid to the National Capitol Region staff,  Pl.'s Mot., Ex. 3 (Deposition of Jack Faulkner) at 16-19; Compl. ¶ 26, the evidence presented by the plaintiff does not show that his complaints to management indicated a concern that racial discrimination was an underlying reason for the alleged compensation disparity of the National Capitol Region staff.  Even assuming, however, that the plaintiff raised concerns that the pay disparity was based on racial discrimination, the evidence presented by the plaintiff demonstrates that he was going to prepare a document to help the staff address his issues pertaining to adjusting the wages upwards.  Pl.'s Mot., Ex. 3 (Deposition of Jack Faulkner) at 17-

19.

Second, regarding the memorandum submitted to the defendant by the plaintiff, it does not allege that the administrative staff of National Capitol Region was being under-paid because it was primarily composed of African-American employees.  Def.'s Mem., Ex. 3 Attach. 14 (Compensation Memorandum).  Instead, the written proposal states that a review of the current staff compensation would be prudent because the skills and abilities of the National Capitol Region staff made them susceptible to recruiting efforts by the defendant's competitors.  Id. Specifically, the plaintiff opined that, "[a]s a forward-looking organization, [the defendant] must realize that other companies would like to gain this expertise and the secret to [the defendant's] success."  Id.  The memorandum also noted that "the issue is further compounded by the high cost-of-living in the Washington, D.C. metropolitan area and the plethora of competitors and similar organizations that need the same skill sets."  Id.  Nowhere in the memorandum does the plaintiff or the person who prepared the document on behalf of the plaintiff allege that the administrative staff of the National Capitol Region were being discriminated against because of their race.  Rather, the proposal primarily indicates that in order to retain the National Capitol Region's highly skilled and devoted specialists, it was necessary to increase their salaries so the defendant could remain competitive.  "Not every complaint garners its author protection under Title VII."  Broderick, 437 F.3d 1232 (citing Pope v. ESA Servs., Inc., 406 F.3d 1001, 1010 (8th Cir. 2005) (stating that commenting about absence of black employees, without alleging discrimination, was insufficient to qualify as protected activity); Sitar v. Ind. Dep't of Tranp., 344 F.3d 720, 727-28 (7th Cir. 2003) (stating that complaining about being "picked on," without mentioning discrimination or otherwise indicating that "gender was an issue," does not constitute

protected activity, even if the employee "honestly believe[s] [he] is the object of

discrimination").  "While 'no magic' words are required, the complaint must in some way allege

unlawful discrimination, not just frustrated ambition."  Broderick, 437 F.3d at 1232; compare id.

(opining that the plaintiff's memorandum by itself may have not amount to protected activity

because it "did not allege . . . that she was currently being discriminated [or retaliated] against"),

Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512 n. 4 (3d Cir.1997) (general grievance about

working conditions and questioning job security not protected where it did not contain any

reference to conduct that is protected by Title VII), and Barber v. CSX Distribution Services, 68

F.3d 694, 701 (3d Cir.1995) (letter complaining about failure to be promoted, but without

mention of discrimination, is not protected activity because a "general complaint about unfair

treatment does not translate into charge of illegal age discrimination"), with Paquin v. Fed. Nat'l

Mortg. Ass'n, 119 F.3d 23, 32 (D.C. Cir. 1997) (holding employee's letter claiming that

discharge was result of his "age" was a protected activity).  Having failed to establish a prima

facie case, the defendant's motion for summary judgment on this claim must be granted and the

plaintiff's motion for partial summary judgment at to his retaliation claim must be denied.

## 5.  The Plaintiff's Constructive Discharge Claim

The defendant contends that it is entitled to summary judgment on the plaintiff's

constructive discharge claim because: (a) "the undisputed evidence establishes that Wackenhut

did not discriminate against [the] [p]laintiff," Def.'s Mem. at 31; (b) "rather than [an] attempt to

force [the] [p]laintiff out [of his job], the undisputed evidence establishes that Wackenhut (1)

tried to persuade him to stay [and] (2) [to] accept an important new assignment in which the

Company expected [the] [p]laintiff to succeed," id., and (c) "there can be no dispute that [the]

[p]laintiff's future with Wackenhut was bright," id.  In opposition, the plaintiff responds that "Wackenhut constructively discharge[d] him by demoting him from Vice President and General Manager to proposal writer, ending his Wackenhut career, making the terms and conditions of his continued employment intolerable, and creating aggravating factors that forced [the plaintiff] into a voluntary quit."  Pl.'s Mot. at 36.

To establish a claim of constructive discharge, the plaintiff must prove that "(1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the [plaintiff's] conclusion that [he] had no option but to end [his employment." Sisay v. Greyhound Lines Inc., 34 F. Supp. 2d 59, 66 (D.D.C.1998) (citing Villines v. United Brotherhood of Carpenters and Joiners of America, AFL-CIO, 999 F. Supp. 97, 104-05 (D.C. 1998) (citing Clark v. Marsh, 665 F.2d 1168, 1173-74 (D.C. Cir. 1981).  And in assessing whether there was a constructive discharge, "the court must decide whether or not the working conditions in the plaintiff's workplace rose to a level of intolerableness that would have driven a reasonable person to resign." Sisay, 34 F. Supp. 2d at 66 (emphasis added).  The standard is therefore an objective one.  Thus, a constructive discharge "does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior causes the unpleasantness." Taylor, 132 F.3d at 766.

Having previously decided that a genuine issue of material fact exists as to the plaintiff's discrimination claim based on his race, the Court presumes that the plaintiff has satisfied the intentional discrimination prong of a prima facie case of a constructive discharge claim and will therefore immediately proceed to assess whether the second and third prongs of the claim have

been demonstrated by the plaintiff.  As to these latter two prongs, the Court finds that the

plaintiff cannot establish that the working conditions were intolerable and that aggravating

circumstances caused the plaintiff to conclude that he had no alternative other than resignation.

The plaintiff asserts that the defendant made his working conditions intolerable by

changing the terms and conditions of his employment and that aggravating circumstances were

created by:

> (1) demoting [him] from Vice President and General Manager to a proposal
> writer, (2) stripping him of his title of Vice President and General Manager, (3)
> removing his supervisory responsibilities, (4) removing his job responsibilities
> and duties, (5) reassigning him to a differen[t] office, (6) separating him from
> other staff in his Region, (7) placing him in a position for which he had no
> education or training, (8) demoting him without giving him any choice in the
> matter, (9) humiliating him and embarrassing him, and (10) effectively ending his
> career with Wackenhut.

Pl.'s Mot. at 36; Compl. ¶¶ 31-32.

An employee's resignation is actionable as a constructive discharge when the "working

conditions become so intolerable that a reasonable person in the employee's position would have

felt compelled to resign[.]" Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004)

(citation omitted).  The "employee's reasonable decision to resign because of unendurable

working condition is assimilated to a formal discharge for remedial purposes." Id. (citation

omitted).  Satisfaction of this test requires "an aggravated case of . . . a hostile working

environment ." Id. at 154.  In other words, to make out a claim of constructive discharge, a

plaintiff must prove that "aggravating factors", beyond just discrimination forced him to leave his

employment.  Dashnaw v. Pena, 12 F.3d 1112, 1115 (D.C. Cir.1994).  Thus, the District of

Columbia Circuit recently reiterated "that a plaintiff bringing an employment discrimination

claim under Title VII on the theory of 'constructive discharge' must show that the employer deliberately created intolerable work conditions that forced the plaintiff to quit." Veitch v. England, 471 F.3d 124, 130 (D.C. Cir. 2006) (citing Clark v. Marsh, 665 F.2d 1168, 1173 (D.C. Cir.1981). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Id. (citing Suders, 542 U.S. at 141) (citation omitted).  However, the Court made clear that the mere existence of workplace discrimination alone is insufficient to make out a constructive discharge claim, as "[c]onstructive discharge . . . requires a finding of discrimination and the existence of certain 'aggravating factors.'" Veitch, 471 F.3d at130 (quoting Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (citation omitted). "'Aggravating factors' are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job." Veitch, 471 F.3d at 130 (citing Clark, 665 F.2d at 1174).

Here, the Court finds that the plaintiff has not demonstrated that the defendant created a work environment so intolerable that he was left with no reasonable alternative other than terminating his employment.  Although the plaintiff contends that his imminent transfer would have been career ending, he has provided no evidence that supports this contention. See Kalinoski v.Gutirrez, 435 F. Supp. 2d 55, 78 (D.D.C. 2006) ("[A] single instance of workplace 'rejection'- e.g., the denial of a promotion or a lateral transfer - if not 'career-ending,' will not constitute a constructive discharge.").  For instance, the plaintiff has presented no evidence that even suggests that the defendant was seeking to end his career by transferring him to a position his supervisors knew he could not perform and was therefore predestined to fail.  Instead, the

45

record shows that the plaintiff had won the State Department contract approximately two years before the challenged transfer, Def.'s Mem., Ex. 3 (Harris Dep.) at 147, a contract requiring the supervision of at least fifteen to seventeen people, id. at 268, he had recently been offered an office in "an impeccable facility" which he turned down, id. at 205-06, and he never faced any reduction of his compensation and benefits regardless of his position title, id. at 268.  Even though the plaintiff considered the position, "[a] step backwards," id., there is no evidence in the record that indicates that his working conditions had become so intolerable due to the challenged impending transfer that a reasonable person in the plaintiff's position would have felt compelled to resign.  Accordingly, the defendant's motion for summary judgment as to the plaintiff's constructive discharge claim must be granted.

## IV.  CONCLUSION

Based on the foregoing analysis, the Court concludes that the plaintiff is barred by the Human Rights Act's one-year statute of limitations from pursuing any claims of discrimination that allegedly occurred prior to November 12, 2003.  Moreover, the Court finds that the plaintiff has failed to prove that he will be able to establish at a trial his hostile work environment claim, his retaliation claim, his claim of discrimination based on the alleged racial jokes and comments made by other Wackenhut employees and his constructive discharge claim.  However, the Court concludes that a genuine issue of material fact exists as to the whether the plaintiff was being discriminated against based on his race in regards to the decision to transfer him from his position at the National Capitol Region.  Accordingly, the defendant's motion for summary judgment is granted as to the plaintiff's hostile work environment claim, his retaliation claim, and his race discrimination claim based on jokes and comments made by the defendant's other

employees, and his constructive discharge claims, and denied as to the plaintiff's claim of race

discrimination based on the decision to transfer him from his position at the National Capitol

Region.  Finally, the plaintiff's motion for partial summary judgment on his constructive

discharge and retaliation claims is denied.[26]


_____/s/_____
REGGIE B. WALTON
United States District Court Judge

---

[26] An order consistent with this memorandum opinion was filed on September 28, 2007.